

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00353-CR

KYRA POINTON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In one point, Appellant Kyra Pointon appeals her conviction of seven counts of cruelty to livestock animals. We affirm.

### II. Factual and Procedural History

On March 10, 2009, deputies from the Denton County Sheriff's Office seized seventeen horses from Pointon and arrested her for animal cruelty. The

---

[1]*See* Tex. R. App. P. 47.4.

State charged Pointon with seven counts of cruelty to livestock animals by intentionally or knowingly failing unreasonably to provide necessary food, water, or care for seven horses in her custody. *See* Tex. Penal Code Ann. § 42.09(a)(2) (West 2011). The seven horses were described as a sorrel gelding (count 1), a bay-colored paint colt (count 2), a bay quarter horse gelding (count 3), a black mare (count 4), a gray pony (count 5), a gray fine-boned mare (count 6), and a grulla mare (count 7).

## A.  General Horse Health

Deputy Kirk Sissney, the animal crimes investigator for the Denton County Sheriff's Office who specializes in large animal cruelty cases, testified that he had completed basic animal control officer training in addition to an animal body scoring certification. His training taught him how to look at the body condition score of the animal and see how the animal's muscle layers and fat layers are built; to determine whether the animal has clean water, proper nutrition, proper veterinary care with regard to vaccination history; and to handle animal-specific situations, such as hoof work on a horse. He had also received specific training on horse nutrition, anatomy, and health care. Deputy Sissney explained that body condition scoring is "taking an overall look at an animal and determining . . . on a set scale and pattern as to what level that animal's muscle mass, fat retention, overall nutritional health is."

Deputy Sissney educated the jury about body condition scoring for a horse:

2

To body condition score an animal . . . we start with the front of the animal looking at the head.  You're going to be looking along the top line of the animal which would be the neck, the withers, the back, the rump, the croup, and the tail head which would be all along the top. . . .  [W]hen you're looking at a horse you will start with the area around the face.  You're going to look for the area around the eyes that will be sunken in, kind of a bug-eyed appearance to them.[ ]  The next area we move to would be the neck region.  You would look for the depth of the neck to see how—see that it—you make sure it comes down, a good full neck.  Also you would look for loss of muscle mass in this area right here.  You would be able to see the spine in the neck on a very thin horse.  Next you would move to the withers.  The shoulder blades—where the shoulder blade comes up . . . this area right here where you see actually this crease that's right here, this is going to be the scapular ridge.  That's the front blade of the shoulder.  As the horse loses muscle mass you're actually going to see that ridge become very pronounced, and that's going to lead you up to the withers right here where you will see . . . to about the midline of the croup is you're going to have—where the spinal process actually stands up above the horse's shoulders— above the horse's back like this. . . .  The hip plane, the croup area, you will see what—you will see what is called the hooks and the pins which is  basically the two front points, the front point and the back point on the large bones that the hip bone that—as the—as the muscle mass deteriorates you will see those points sticking out. . . .  As the muscle mass deteriorates you will see a plane surface where those points are sticking out very prominently. . . . The last place we go as far as the back is the tail head.  Any time you see this tail head, that's a pretty indicative sign of a horse that's in bad body shape.  It should look like the hair comes strai[gh]t out of their butt, there should not be any tail head showing.  You shouldn't see that.

Deputy Sissney testified that after the initial assessment described above, he would move on to other areas such as hoofs, teeth, ribs, and abdominal area to get an overall picture of the animal's general health.  He also explained that horses need healthy hooves so that they can walk to get to food and water, that walking contributes to a horse's ability to digest its food, and that a horse's hooves should be checked for cracks, chips, and splits daily or every other day

3

and the bottom of the hooves should be checked for stones and damage because if left unchecked, sore spots or infections could develop. Deputy Sissney stated that severe overgrowth of hooves is extremely painful for a horse and that it is not difficult to maintain a horse's hooves on a regular basis.

Deputy Sissney explained that although a horse's ribs might be the first thing one would see, it would be one of the last things to check because "an animal's body weight can fluctuate due to parasite loads, nutrition, or if it's just a lack of water," so the animal's condition had to be judged by the totality of the circumstances. Teeth would be the last thing to check; if the horse's teeth were in bad shape, then the horse would not be able to process food to a degree that the enzymes and bacteria in its gut could break down the food.

Deputy Sissney explained that the scale for body condition scoring is one to nine, with one being a "walking skeleton" and nine being "very obese." A healthy horse weight would be a five; for anything that fell below a five, "you would have to look for reasons why that animal is not maintaining its body weight." Deputy Sissney said that when a horse is not in ideal body condition or is in a compromised nutritional state, its nutritional needs will differ from a regular, healthy horse and it will not have the gut load bacteria to handle eating a bale of hay.

Dr. Sherri Swanton, a veterinarian, testified that a body condition score of four or five out of nine is an ideal score for an animal in good shape and receiving exercise. She also said that horses, depending on the size and activity,

4

need at least ten gallons of water a day. And depending on whether a horse is receiving concentrated feed, it needs to consume around 1.5% to 3% of its body weight in feed per day, so a 1000-pound horse needs to receive around twenty pounds of dry feed daily. She also stated that parasites can keep a horse from receiving adequate nutrients and can make a horse anemic because parasites are usually blood feeders; regular de-worming practice is part of good horse health. Dr. Swanton said that when hooves are left in poor condition, this increases the risk of abscesses or foundering, the tearing of the hoof wall, which is similar to ripping off a fingernail. Dr. Swanton said that when a horse is in pain, it will not want to eat or stand.

## B. The Seven Seized Horses

Dr. Swanton testified that in early March 2009, she examined seven horses that the Denton County Sheriff's Office had seized, gave them complete physical exams "from nose to tail," and took blood and fecal samples, and she testified, as set out below, about the horses' conditions. The trial court admitted Dr. Swanton's report, State's Exhibit 184, into evidence. Deputy Sissney was involved in the seizure of the horses, and he described their conditions at the time of the seizure.

### 1. Count 1: Ben

The jury saw photos of Ben, an emaciated sorrel gelding. The photos showed that Ben's mane was matted, that he had burrs in his coat, and that he had a distinct lack of musculature. Deputy Sissney stated that even with Ben's

long winter coat, "you can still see a clear demarcation between the ribs, probably deep enough to lay your fingers in." He said that Ben was very underweight based on his bug-eyed appearance and the thinness of his neck, noting, "You can actually see where the spine is starting to come through," and pointing out the ridge starting to form where the muscle had begun to deteriorate away from Ben's spine. He opined that Ben's winter coat might have camouflaged additional issues.

State's Exhibit 8 showed Ben's front right hoof with duct tape on it. The officers removed the duct tape, and Deputy Sissney stated that State's Exhibit 10 showed rough spots where the nails used to put the shoe on "ruptured through the lamina on the top of the hoof"—an indication of lack of proper care. State's Exhibit 11 showed a piece of plastic the officers found bound underneath the hoof when they removed the duct tape—it looked like the bottom of a milk jug that had been cut off. When the plastic fell off, a "green sock mess" fell out underneath it. The mess was green pus, and Deputy Sissney testified that he did not think he had ever smelled "that particular smell associated with a live animal. It was—it was nauseating." He clarified, "[I]t smelled like necrosis, like dead tissue and infection."

Ben's front right hoof injury was severe and very limiting for his mobility. Ben's hooves were also severely overgrown and had chipped and split, and, with regard to State's Exhibit 4, a photo showing Ben's hooves, Deputy Sissney stated, "You can see this was—and—and it has been that way for some time,

6

because even places where you have chips and cracks, now they have rounded off from—from walking, you know. So even some of the—this has been a long time in forming." The photos also showed that Ben did not have appropriate bedding for a horse with a hoof injury. Further, because of Ben's muscle degradation, his ribs had fallen and sunken to the point that he could not breathe at full capacity.

Dr. Swanton said that Ben had a body condition score of one—the bottom of the body condition score scale. He was unable to bear full weight on all four limbs; in her written report, Dr. Swanton noted that most of the sole wall on Ben's abscessed foot was peeling away and a deeply penetrating hole was present. Ben's toe length was excessive, which could affect the hoof wall and cause laminitis or tearing of the hoof wall.[2] Dr. Swanton cleaned the hoof with a hoof pick, probed it to determine the actual depth of the abscess, and checked for pain sensation to determine if it was a new wound. She determined that the abscess was "chronic," which she defined as "[l]onger than a couple of weeks," based on the scab formation on the abscess and the hoof's condition.

Dr. Swanton explained how she would treat the horse's abscess if he had come to her as a patient:

---

[2]Dr. Swanton testified that abscesses can be caused by having too long a hoof and they are very common in horses whose feet are not regularly trimmed. Further, a bruise to the sole of the foot due to stepping on a rock or a penetrating wound such as stepping on a nail could cause a hoof to develop an abscess. She explained that an abscess is "a pocket of pus" that builds bigger and bigger, causing pressure and pain.

The first thing I would have done—well, initially would be to pull the shoes, have the feet trimmed to the correct length, apply new shoes for support, and also apply a hospital plate, which is basically a metal plate underneath the shoe. And then pack—pack gauze and medication up inside of there to help heal that abscess.

And the only reason why I say that is because when it's as bad an abscess as this particular one was, it actually is infecting the bone of the last digit, and so it needs more than just your typical what-you-do-for-an-abscess duct tape covering.

Ben's bone had become infected, which Dr. Swanton said would have been very painful.[3] In Dr. Swanton's opinion, Ben had not been receiving adequate care to maintain a good state of health—he was in pain and "was very, very thin."[4]

In her written report, Dr. Swanton stated,

With his physical appearance and care of the feet on this horse alone, [i]n my professional opinion I can honestly say that this horse has not reasonably been provided with the necessary food to maintain his body condition, nor the care that is necessary to maintain his feet or take care of his de-worming needs to the extent required to maintain him in a state of good health. It should also be noted that this horse's feet were severely neglected causing unjustifiable pain and suffering for a long period of time.

During trial, Dr. Swanton explained her comment about Ben undergoing unjustifiable pain and suffering by stating that a call to a farrier could have

---

[3]On redirect examination, Dr. Swanton agreed that the shoeing pad, plastic, and duct tape that had been put on Ben's abscess was the equivalent of a human putting a Band-aid over a wound with a deep infection that required treatment. State's Exhibits 177 and 178 were x-rays of Ben's foot, showing inflammation of the bone from the abscess.

[4]Ben also had a couple of parasites, but Dr. Swanton agreed on cross-examination that his parasite count could potentially reflect that he was between de-worming treatments.

8

remedied the abscess.  Dr. Swanton said that a farrier charges around $30 for a trim.

### 2.  Count 2:  Bay Paint Colt

State's Exhibits 18 through 22 showed a bay paint colt whose eyes bugged out and who was thin along the edge of his muscles.  With regard to the colt's hooves, shown in State's Exhibit 20, Deputy Sissney stated, "They're very overgrown, cracked, split, chipped out in places.  I'm not sure that this horse is in a position yet of being—not being able to walk around, but it's getting pretty close, especially with—you can see where this is actually grown out and beginning to roll under now," showing lack of proper care.

Dr. Swanton said that the colt's body score was a four and that he had the pot-bellied appearance characteristic of a horse with a lot of parasites; his lab results showed that he had one of the largest parasite counts of all seven of the horses.  Dr. Swanton testified that the worms could have easily been removed by using commercial de-wormer from a feed store if the horse had been on a regular de-worming schedule.  Her conclusion was that the colt had not been receiving adequate care to maintain its good health, based on the parasite load.  On cross-examination, Dr. Swanton testified that it takes between twenty-four and forty-eight hours for a de-worming treatment to decrease the parasite level and that such a treatment lasts for up to two or three weeks, depending on the worms' life cycles.  She said that with the amount of parasites he had, the colt would probably have required more than one treatment to rid him of the worms, but she

also agreed that if the colt had received a de-worming treatment, he would have been fine within twenty-four hours.

### 3. Count 3: Bay Quarter Horse Gelding

State's Exhibits 23 through 27 show a bay quarter horse gelding. Deputy Sissney testified that the horse had bugging eyes, showing there was no fat reserve built up behind the eyes to keep the lids pushed out the way they needed to be, the horse's scapular ridge could be seen even through its long winter coat, and his neck was very thin. State's Exhibit 25 is a photo of the bay quarter horse gelding's hooves' cracks, splits, and chips along the front edges, showing a distinct lack of proper care for the animal, according to Deputy Sissney. State's Exhibits 26 and 27 show that the horse was in the same poor condition as the other horses—his ribs showed, and his musculature had degenerated.

Dr. Swanton gave the horse a body condition score of two and said that he appeared to have suffered significant muscle loss. He did not have parasites, but he had a "pretty high white [cell] count of 17,500," indicating that he was fighting an infection. She also said that this horse, based on his physical appearance, did not appear to be receiving adequate nutrition to maintain himself in a good state of health, "and his blood work basically confirmed that."

### 4. Count 4: Black Mare

State's Exhibits 28 through 31 show a pregnant black mare. Deputy Sissney stated that the mare's photo revealed that her muscles had degraded, her neck was rounded where there was nothing filling in between the trachea and

the spine area, her eyes were bugging, and there was a general lack of tissue in her face. Her mane was unkempt and full of burrs. Her hooves had not received proper care, and Deputy Sissney stated, "There's a crack . . . that runs all the way up into that hoof line in that hoof," which he said was painful for the horse, like a human splitting a fingernail. He opined that the mare had not been receiving the necessary food, water, or care to maintain her in good health.

Dr. Swanton gave the mare a body condition score of four and said that she had normal bloodwork, although she carried a large parasite load. Dr. Swanton said that she would have liked the mare's body condition score to be higher "because in the next trimester the foal will require a significant amount of nutrients from the mare, and that body condition score will lower if not fed appropriately." Based on the fecal exam, Dr. Swanton concluded that the mare was not receiving adequate de-worming to maintain herself in a good state of health. Two days following her exam, the mare lost her fetus.

### 5. Count 5: Princess

State's Exhibits 32 through 41 show Princess, an old gray female pony with a very emaciated body. Deputy Sissney said that Princess was unkempt, with a lot of matting and burrs stuck in her coat. He acknowledged that "[d]ue to her advanced age it wouldn't be uncalled for to see her a little bit on the thin side," but he also said that Princess should have been "not near as thin as we found her that day." State's Exhibits 33 through 38 show in gruesome detail that Princess was severely emaciated as well as suffering from the same lack of care

11

as the other horses. Deputy Sissney stated that it takes a long period of neglect for a horse's hooves to reach the poor condition that Princess's hooves were in.

Dr. Swanton gave Princess a body condition score of 1.5. Dr. Swanton said that a horse of that age would require a higher nutrient content in her feed because she would not be able to process the feed like a young horse. Princess's hooves were not well maintained, and she had a very large number of parasites. Dr. Swanton opined that Princess was not receiving adequate food and water to maintain her in a good state of health.

### 6. Count 6: Gray Fine-boned Mare

State's Exhibits 42 through 46 showed a pregnant gray fine-boned mare with the same body condition and lack of proper hoof maintenance as the other horses. State's Exhibit 46 also showed that the gray fine-boned mare had severe diarrhea, which Deputy Sissney testified could be life-threatening if the horse did not get enough water or nutrition to fight it off.

Dr. Swanton gave the mare, who was nine months into her eleven-month pregnancy, a body condition score of two and said that a body condition score of two was not acceptable for a pregnant horse. The mare was sick and suffering from edema (fluid pooling) due to low protein in her body. Dr. Swanton concluded that the mare was not receiving an adequate amount of nutrition to maintain a pregnant mare in good health.

### 7. Count 7: Grulla Mare

State's Exhibits 47 through 51 show a grulla mare. She suffered from the same problems as the other horses regarding her thinness and lack of appropriate muscle covering. Dr. Swanton gave the grulla mare a body condition score of four, stating that she was in pretty good condition compared to some of the others, even though she had a high parasite load.

### 8. Summary

Deputy Sissney explained that "none of these animals were lively. None of them were—they just stood there. They were just like, you know, sacks of meat on legs." In contrast, he said that the general personality of a horse that has received good care is inquisitive, stating that

> they're going to come up to you as probably as much as they want to see what you're doing. They're going to want to know why you're there. . . . You know, if they're a friendly horse, they're going to follow you around wherever you're going, you know, wanting you to feed them, wanting you to pet them, wanting to be close to where you are.

Deputy Sissney said that when horses have not received the necessary food, water, or care to keep them in a good state of health, they do not maintain a friendly, lively personality. Rather, they become very withdrawn, as these horses were.

Deputy Sissney and Dr. Swanton both stated that they did not know when Pointon acquired any of the horses. Pointon bought and sold horses, and she told Deputy Sissney that she acquired horses at sale barns and then brought

13

them home to get them into shape to sell.[5]  Deputy Sissney said that his department investigates around four animal cruelty reports a week and that the decision to seize animals is based on the totality of the circumstances but "[t]he prolonged and systematic lack of proper care to the hoofs and teeth weigh[ ] a lot more heavily than an empty water barrel."  Deputy Sissney stated that none of the seven horses had the necessary food, water, or care to maintain them in a good state of health.

### 9. Post-Seizure

After the horses were seized, they were placed in the care of Mr. Webster at the Webster Ranch in Ponder before being transferred to Hope for Horses, a nonprofit equine rescue sanctuary.  Anastasia Keyser, the nonprofit's president and founding director, said that she became the seven horses' caretaker after the seizure and was involved in their rehabilitation.[6]

Keyser said that Ben was in "very, very poor shape" when he came into her custody, stating, "[h]e was barely able to walk.  His feet were extremely long.  They hadn't been trimmed or anything in a very long time.  He even still had

---

[5]According to Shannon Flanagan, another witness, the horses that Pointon bought at horse auctions were usually not in good shape.

[6]Keyser said that the goal of Hope for Horses is to rehabilitate horses and then put them up for adoption.  Before rescue horses can be adopted, the nonprofit gets the horses to the proper weight, makes sure there are no underlying physical conditions that are left untreated, makes sure that the horses' teeth and feet are in good condition, and updates their shots, de-worming, and Coggins test, which is a test to make sure a horse does not have equine infectious anemia.

14

shoes on his front feet. And he had abscesses and he was extremely underweight." Keyser testified that her veterinarian and a farrier worked together to sedate Ben and trim his feet. When her veterinarian initially cleaned the abscess, he found additional abscesses—four to five in each front foot. It took about a month to heal the first abscess and then Ben went for a month or two without abscesses, but he was abscess-prone because of his laminitis,[7] and the abscesses recurred five to ten times. Ben was never without pain. Ben was euthanized in July 2010 after a veterinarian who specialized in foundered laminitic horses was unable to help him.[8]

Keyser took the photo of the gray pony, Princess, in State's Exhibit 41 in September or October 2009. State's Exhibit 41 showed Princess eating chopped alfalfa. Keyser said that Princess also received soft pellets in her diet and that Princess was still in her custody, was in a good state of health, was on regular parasite treatment, and saw a farrier every six to eight weeks. A photo of the bay quarter horse gelding taken in May 2009—State's Exhibit 186—was shown to the jury, as were photos of the black mare taken in September or October 2009—

---

[7]Keyser testified that laminitis can be caused metabolically by not giving a horse proper care and starving it or giving it too much protein too quickly. It can also be caused physically through an injury. Laminitis can be permanent if there has been rotation in the horse's coffin bone; there was rotation in Ben's coffin bone when Keyser took custody of him. Deputy Sissney testified that the bone is called the "coffin bone" because "if you have a problem with that bone it means the horse needs to be put down, dead."

[8]Dr. Swanton testified that the decision to euthanize would be based on the horse's quality of life and how well he responded to treatment.

State's Exhibits 187 and 188. State's Exhibits 189 and 190, from September or October 2009, showed the gray fine-boned mare post-adoption. State's Exhibits 191 and 192 contained photos of the grulla mare taken in September or October 2009. Keyser's veterinarian adopted the grulla mare. These photos showed that these horses were no longer emaciated and that they were clearly healthy and cared for.

## C. Pointon's Arrests and the Seizure of the Horses

Deputy Sissney testified that he made contact with Pointon on March 6 after her arrest on outstanding warrants for "animals at large" to check on the welfare of Pointon, her daughter, and her animals while she was in custody. He asked Pointon who was going to take care of her horses while she was in jail on her warrants, and Pointon told him that Shannon Flanagan would take care of them. Pointon had been staying at Flanagan's house. Pointon did not say anything to him about having water or hay or other food for the horses on her three-acre property on FM 2450 (the FM 2450 property).

Deputy Sissney talked with Flanagan to determine whether she was going to bring food and water to the horses at the FM 2450 property. Flanagan brought food and water for the horses that weekend.[9] Pointon was released on March 7. Pointon called Deputy Sissney on March 9 and told him that she had moved

---

[9]Flanagan said that she received a phone call from an animal control officer in the middle of the night and that she agreed to bring food and water to the horses at the FM 2450 property.

16

some of the horses from the FM 2450 property out to her new address on Klein Road and that she had some hay delivered.

On March 10, deputies seized Pointon's horses and arrested Pointon at Flanagan's house. Deputy Sissney testified that the decision to seize the horses was based on "a prolonged systematic lack of care for the[ ] animals."

### 1. FM 2450 Property

Deputies began the seizure proceedings at the FM 2450 property. There were no horses there, and the property appeared to be abandoned—the electric meter had been pulled from the meter box, the side door on the south side of the residence was standing ajar, and the inside of the house appeared to have been ransacked with clothes "in piles, things pulled off of hangers." Deputy Sissney said that there was no hay at the FM 2450 property. The water troughs were empty. He also did not find any supplemental feed for the horses, such as grain, oats, or pellets.

The trial court admitted into evidence photos of the FM 2450 house and its surrounding acreage. State's Exhibit 79, a photo of the pasture outside the FM 2450 house, shows no supplemental grazing pasture and there is nothing for the horses to eat in the pasture.[10] State's Exhibit 80 shows a water trough

---

[10]During cross-examination, Deputy Sissney agreed that the photo of the pasture in State's Exhibit 85 showed a round bale of hay, but he did not know when that photo had been taken or by whom. There were no horses on the property on March 10, and State's Exhibit 85 shows a horse standing near the bale of hay.

17

containing water with debris and algae floating in it; according to Deputy Sissney, it would not be adequate or healthy for the horses to drink. There was no horse feed in the shed.

### 2. Klein Road Property

Pointon's new address on Klein Road was the deputies' next stop. No one was home, but there were ten horses there, and they seized them.

The Klein Road property had a house and barn with surrounding pastures, but Deputy Sissney did not know whether the pastures belonged to the Klein property. Three of the ten horses were in the front round pen, and the other seven were scattered in different stalls in the open barn area. A rope held each animal in its individual stall.[11]

The jury viewed photos of the Klein Road residence, the corral in front of the property, and the stable area. None of the stalls in the stable had doors on them. State's Exhibit 113 shows an empty water bucket hanging on the inside of a stall. State's Exhibit 114 shows the inside of that stall with a pony in it; Deputy Sissney said that it looked like the stall had not been mucked out for a couple of days.

Two other photos showed buckets containing water that were sitting on the ground, which Deputy Sissney said would make it very easy to contaminate the water with feces. State's Exhibit 130 was a photo of one of the horses at the

---

[11]State's Exhibits 21 and 22 are photos of the bay paint colt at the Klein Road address where he was seized.

Klein Road property, showing that it had gotten out of its stall while the officers were trying to round up some of the other horses. Other photos showed FM 2164, a major north-south byway in the north part of the county, in the background, and the lack of the fence, constituting a danger to the horses if they escaped onto the road. The officers could not access the Klein Road house so they did not know if the electricity was turned off there, although the meter bore a green removal tag.

During cross-examination, Deputy Sissney admitted that there was grass on the ground at the Klein Road residence and two round bales of hay in the barn. On redirect, he described the hay at the Klein residence as "very old. It had a lot of mold and dust and mildew when we began to pull part of it off. It was very poor quality. Probably very low nutritional value left in it because of the age of the hay."

### 3. Flanagan's Property

Pointon had brought six of her horses to Flanagan's about two weeks prior to her arrest. The officers went there after visiting the Klein Road property. Flanagan pointed out the horses that belonged to Pointon. Pointon was arrested at Flanagan's house.

Flanagan, who teaches horseback riding at her riding academy, described Pointon's horses as having long coats with dull hair and said that they looked "a

19

little bit wormy."[12]  Flanagan said that a horse receiving good quality feed will typically have a shiny coat, even if it still has its winter coat, because of the nutrients in the feed; she said that worms can contribute to lack of shine and that when a horse has a dull coat, "that's usually an indicator that there's something going on."  One of the first things Flanagan did for the horses when they arrived on her property was to de-worm them because worms can be dangerous to a horse.

Flanagan stated that the horses needed to be seen by a farrier because when horses' hooves are not regularly trimmed, it can cause the horses pain, and that it appeared that most of the horses had not seen a farrier in a very long time.  Flanagan had a farrier come out, but he did not tend to all of the horses. Flanagan paid for the farrier out of her own pocket.  Flanagan stated that two of Pointon's horses were pregnant; one had her foal while on Flanagan's property.

During the three weeks that the six horses were on Flanagan's property, they had access to fresh hay, received grain twice a day, and gained weight— Flanagan estimated that the bigger horses gained around 100 pounds.  She fed the horses "Equine Senior," even though these horses were not old, because the pellets were soft and easier to digest, so it would be easier for the horses to gain weight.  Flanagan said that the horses looked like they needed the nutrients in

---

[12]Flanagan explained that when a horse has worms, it will appear to have a pot belly and will not "look as fleshy everywhere like a horse that's in good condition."

the Equine Senior because to her they appeared to be severely nutrient-deprived, in addition to needing a farrier's attention for their hooves.

Officers removed five of Pointon's horses from Flanagan's property. They did not transport the mare and her week-old foal because they were afraid the foal would injure itself in transit. Flanagan was left in charge of those two horses. Flanagan fed them, had them seen by a farrier, and said that she would have taken them to a veterinarian if needed. Hope for Horses took the mare and foal after the foal was weaned.

Flanagan testified that she had known that Pointon had a horse with a hoof problem because she had been with Pointon at a feed store when Pointon bought some pads for the horse's feet. Pointon told her about three weeks before the horses were removed that she had acquired the horse from a shipper in California and that the horse had an abscess. The horse with the abscess was never on Flanagan's property, and Flanagan opined, based on working with horses her entire life, giving riding lessons for twenty-five years, her degree in animal science, and her status as a registered veterinary technician, that padding the horse's foot was not the proper way to treat an abscess on a hoof. Flanagan explained that when one of her horses had an abscess, the farrier would come out, drain the abscess, soak the foot in Epsom salt to draw out the infection, pack the foot with a drying agent, and then repair the horse's sole; depending on the severity of the abscess, the horse might also be given an anti-inflamatory for pain. Flanagan said that abscesses are not usually fatal in horses and that for an

21

average healthy horse, from abscess diagnosis to being healthy again takes around a week.

### D. Pointon's Neighbors' Testimonies

Max Redding, Lewisville Police Officer Max Gherke, and Karen Harkins lived near Pointon's three-acre property on FM 2450.

Redding testified that he and his family had lived next to Pointon's property since July 2006, when Pointon had three to four horses. He had noticed an increase over time in the number of horses she kept on her property, which caused him concern about possible health issues that could spread across the property line. Redding also noticed that the horses were thin, and he did not see hay being delivered weekly or bi-weekly.

Officer Gherke testified that he shared a fence line with Pointon and that they had been neighbors for two or three years. He did not recall the number of horses Pointon had when she first moved in but said that her herd had grown to around fifteen. Officer Gherke said that this concerned him because the horses did not appear to be taken care of, were kept in a confined space, and did not seem to get food or water on a regular basis. Based on his conversations with other neighbors, he did not call animal control because he was confident that animal control had been notified about the horses' condition. He recalled seeing a horse with a duct-taped hoof for a while, but he did not recall how long Pointon had had the horse.

Officer Gherke said that he saw hay delivered to the property before the seizure. He did not know the people who had delivered the hay—a woman who was not Pointon had come to his house inquiring about the horses' condition and when she and her husband returned, they delivered hay bales and Officer Gherke provided water for the horses because Pointon had no electricity to run her pump.[13]

Harkins testified that she lived down the road from Pointon. She had agreed to let six or seven of Pointon's horses use Harkins's four-acre back pasture for $200 per month. Harkins said that Pointon was still responsible for providing the horses with food and giving them water. Harkins said that at one point, in the fall or winter of 2008, she and her husband noticed that the horses were not being watered, so they started watering them for Pointon. They also noticed that food was not being brought on a regular basis.

Harkins said that it would take the horses three to four days to go through a bale of hay but that hay was not delivered every three to four days—a long enough time elapsed between deliveries that she worried about the horses getting fed. She and her husband noticed that the horses' ribs were starting to show more and that their hip bones were becoming more obvious; she did not remember them being so thin when they were first put in her back pasture. The horses' condition became bad enough that she worried that there would be

---

[13]The electricity had been turned off at Pointon's house, and her well pump would not work.

animal cruelty charges, so her husband wrote Pointon a letter on February 27, 2009, telling her about their concern for the animals' welfare and telling her that they wanted them removed from the property. By that point, Pointon had not paid the horses' rent in several months, and the Harkinses had previously tried to contact Pointon by email, text message, and voice mail.

After delivering the February 27 letter and before sending another letter on March 5, Harkins and her husband called the sheriff's department about the horses "just to let them know what the situation [sic] kind of ahead of time." The horses were removed from her property on March 9. Harkins said that based on her notification and conversations with Pointon before the horses were removed from her property, she believed that Pointon knew about the horses' condition.

## E. Hay Delivery

Contrary to Pointon's neighbors' testimonies, Randy Bentley, who worked at Schertz Feed in Sanger, testified that he sold and delivered around two or three round bales of hay—weighing 900 to 1,200 pounds each—per week to Pointon. He did not have any records or receipts because Pointon had a deal with the feedstore's owner: the owner had hay near the FM 2450 property and he would deliver hay to her when she called.

With regard to the hay at the Klein Road residence, Bentley said that he knew hay had been delivered to the Klein Road residence at least once. On cross-examination, Bentley admitted that when previously asked by the State if it would surprise him to learn that the hay was old, he had said that it would not

surprise him. He also admitted that he had told the State that it would not surprise him because that was what Pointon had specifically ordered.

## F. Verdict

A jury found Pointon guilty on each count and assessed her confinement at 365 days for each count. They assessed a fine on count one of $2,500; a fine on count two of $1,000; a fine on count three of $1,500; a fine on count four of $2,000; a fine on count five of $1,500; a fine on count six of $2,000; and a fine on count seven of $1,000. The jury also recommended to the trial court that Pointon be granted community supervision. The trial court sentenced her in accordance with the jury's verdict, suspended the sentences, and placed Pointon on twenty-four months' community supervision. This appeal followed.

## III. Sufficiency

In her sole point, Pointon argues that the evidence is insufficient to support her conviction for cruelty to livestock animals.

## A. Standard of Review and Applicable Law

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

25

Pointon was charged with intentionally or knowingly "fail[ing] unreasonably to provide necessary food, water, or care for a livestock animal in [her] custody." *See* Tex. Penal. Code Ann. § 42.09(a)(2). A jury may infer a culpable mental state from the circumstances surrounding the cruelty to animals offense. *Martinez v. State*, 48 S.W.3d 273, 276 (Tex. App.—San Antonio 2001, pet. ref'd) (citing *Pine v. State*, 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), *cert. denied*, 516 U.S. 914 (1995)). "Necessary food, water, or care" includes food, water, or care "provided to the extent required to maintain the livestock animal in a state of good health." Tex. Penal Code Ann. § 42.09(b)(6). "The quantity and quality of food necessary to sustain a horse is a matter of common knowledge among persons familiar with the care of horses." *Cross v. State*, 646 S.W.2d 514, 515–16 (Tex. App.—Dallas 1982, pet. ref'd) (defining "necessary food" as "food sufficient in both quantity and quality to sustain the animal in question").

## B. Analysis

The testimony of Dr. Swanton, Deputy Sissney, and Flanagan establish that the horses had not been receiving sufficient food and care, based on their poor physical conditions, including their low body condition scores, emaciation, parasites, and lack of adequate hoof maintenance. Further, Pointon's neighbors testified that they either did not see hay being delivered regularly for Pointon's horses or that they were concerned about the horses receiving enough to eat. And while Bentley, the feed store worker, testified that the feed store delivered

26

two to three round bales of hay to Pointon each week in 2008 and 2009, he also admitted that the hay delivered to the Klein Road house was old because that was specifically what Pointon had ordered, and other witnesses testified that old hay would not provide adequate nutrition. Furthermore, Deputy Sissney and Harkins testified about the lack of available water or clean water for the horses, and Officer Gherke testified that Pointon could not use her water well at the FM 2450 property because her electricity had been shut off.

Pointon argues that the evidence is insufficient because no witness knew when she "[came] into possession of the horses or the condition of the horses when she acquired them." She complains that for her to maintain the horses in good health, the horses had to attain good health first, and she asserts that there is no evidence that the horses were ever in a better state of health. However, even if the horses had been in poor condition when she received them, the photographic evidence showing the near-miraculous recovery of all of the horses but Ben after the horses received food, water, and care from Hope for Horses belies this argument. Further, Flanagan's testimony established that Pointon was aware of Ben's abscess at least three weeks prior to the seizure of the horses and that a properly treated abscess can heal in a week, and Dr. Swanton testified that a farrier—which, based on their overgrown hooves, none of the horses had seen in a long time prior to the seizure—could treat an abscess. The jury could have found that Pointon allowed Ben's condition to reach irremediable deterioration before he was seized from her based on her failure to provide him

27

with necessary care. And, as to all of the horses, the jury could have reasonably inferred that Pointon knew of the inadequacy of the food, water, and care that she supplied before the March 10 seizure based on their physical appearances as well as Harkins's February 27 and March 5 letters sent to Pointon expressing concern about the horses. Viewing the evidence in the light most favorable to the verdict, the jury could have found the essential elements of each count beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. Therefore, the evidence is sufficient to support Pointon's conviction on all seven counts of cruelty to livestock animals, and we overrule her sole point.

## IV. Conclusion

Having overruled Pointon's sole point, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 15, 2011

28